AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| United States of America | |
| v. | Case No. |
| ROBERT BELTRAN, | |
| Defendant(s) | 19 MJ02493 |

FILED
CLERK, U.S. DISTRICT COURT

JUN 1 3 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 7, 2019, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| *See attachment.* | *See attachment.* |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
_____
*Complainant's signature*

Frankie M. Valle, Task Force Officer
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  June 13, 2019

/S/
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Frederick F. Mumm, U.S. Magistrate Judge
_____
*Printed name and title*

**ATTACHMENT**

COUNT ONE
[26 U.S.C. § 5861(d)]

On or about February 7, 2019, in Los Angeles County, within the Central District of California, defendant ROBERT BELTRAN ("BELTRAN") knowingly possessed a firearm, namely, an AR-style 5.56mm caliber semiautomatic rifle, bearing no serial number, and of unknown manufacture, which defendant BELTRAN knew to be a firearm and short-barreled rifle, as defined in Title 26, United States Code, Sections 5845(a)(3) and 5845(c), in that it was a rifle having a barrel of less than 16 inches in length, and which had not been registered in the National Firearms Registration and Transfer Record, as required by Chapter 53, Title 26, United States Code.

COUNT TWO
[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about February 7, 2019, in Los Angeles County, within the Central District of California, defendant ROBERT BELTRAN knowingly and intentionally possessed with intent to distribute material containing psilocyn and/or psilocybin, a Schedule I controlled substance.

COUNT THREE
[18 U.S.C. § 924(c)]

On or about February 7, 2019, in Los Angeles County, within the Central District of California, defendant ROBERT BELTRAN knowingly possessed a firearm, namely, AR-style 5.56mm caliber semiautomatic rifle, bearing no serial number, and of unknown manufacture, in furtherance of a drug trafficking crime, namely, Possession With Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), as charged in Count Two of this Complaint.

## **AFFIDAVIT**

I, Frankie M. Valle, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.     This affidavit is made in support of a criminal complaint and arrest warrant for ROBERT BELTRAN ("BELTRAN"), for a violation of 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm), 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Possession of Controlled Substances With Intent to Distribute), and 18 U.S.C § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime) (collectively, the "SUBJECT OFFENSES").

2.     This affidavit is also made in support of an application for a search warrant for three Apple iPhones (the "SUBJECT DEVICES") currently in the custody of the Pomona Police Department ("PPD"), that were seized on February 7, 2019 during a PPD investigation that led to the arrest of BELTRAN.  The SUBJECT DEVICES are further described as: a light grey Apple iPhone ("SUBJECT DEVICE 1"), found on BELTRAN's person at the time of his arrest; a black Apple iPhone with a clear brown case ("SUBJECT DEVICE 2"), found in a chair of BELTRAN's bedroom at the time of his arrest; and a white Apple iPhone with a clear brown case ("SUBJECT DEVICE 3"), found in a drawer of an entertainment center in BELTRAN's bedroom at the time of his arrest, and are described more fully in Attachment A to the search warrant, which is incorporated herein by reference.

1

3.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of the SUBJECT OFFENSES, described more fully in Attachment B to the search warrant, which is incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of our investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.     I am a federally deputized Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so assigned since January 2019.  As an FBI TFO, I have received training on a multitude of federal offenses from FBI agents, Drug Enforcement Administration ("DEA") agents and other law enforcement personnel and training venues.  I regularly refer to these laws and regulations during the course of my official duties.  I am currently employed as a Police Detective by the City of El Monte, California, Police Department ("EMPD") and have been a sworn California peace officer since March of 2006.  In my time as a police officer, I have received training in various domains

2

including, but not limited to, narcotics, gangs, firearms, undercover operations, informant management, prostitution and violent crimes. I am currently a member of the El Monte Police SWAT team and a Firearms Instructor.

6. Since January 2019, I have been assigned as a TFO to the San Gabriel Valley Safe Streets Gang Task Force ("SSTF"). The SSTF is comprised of law enforcement personnel from the FBI, EMPD, Pomona Police Department, DEA, Los Angeles County Sheriff's Department ("LASD"), and the California Department of Corrections and Rehabilitation ("CDCR"). The primary mission of the SSTF is to investigate violations of federal law by gang members and narcotics dealers. The SSTF also investigates violent serial offenders, violent fugitives, illegal weapons, and the illegal distribution, manufacturing, trafficking, possession, and sales of controlled substances. Part of the mission of the SSTF is to assist other federal, state, or local law enforcement agencies within the San Gabriel Valley with investigations of gang members, narcotics trafficking, violent crime, or violations of Federal law.

### III. SUMMARY OF PROBABLE CAUSE

7. On February 7, 2019, at approximately 7:50 a.m., the Los Angeles County Probation Department's Special Enforcement and Operations ("SEO") Team responded to 1059 W. Grand Avenue in the city of Pomona, within the Central District of California. The SEO Team was at the location in an effort to conduct a probation compliance check on John Yashu ("Yashu"). Yashu was

3

on active Post Release Community Supervision ("PRCS") with applicable search conditions.

8.   As they attempted to conduct the probation compliance check, several individuals, including BELTRAN, attempted to flee the location, however they were detained by law enforcement in the backyard.

9.   A search of the location revealed a short-barreled rifle, psilocybin mushrooms, marijuana, methamphetamine, MDMA, materials consistent with narcotics packaging, approximately $8,043 in United States Currency, and a scale commonly used to weigh narcotics.

## IV. STATEMENT OF PROBABLE CAUSE

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   Los Angeles County Probation SEO Team Conducts Probation Compliance Check

11.   I have reviewed reports from the Los Angeles County Probation Department and the Pomona Police Department regarding the investigation involving BELTRAN, and I have spoken with the involved parties, and learned the following:

a.   On February 7, 2019 at approximately 7:50 a.m, Los Angeles County Probation Officers assigned to the SEO Team responded to 1059 West Grand Avenue in the City of Pomona, California.  The SEO Team intended to conduct a probation compliance check on the residence.  The location was provided to the Probation Department by Yashu as his residence.  Prior to

4

proceeding to the location, the SEO Team was aware that Yashu
was on active probation, and that a condition of his probation
was that any property under Yashu's control was subject to
search or seizure by Probation Officers and/or California Peace
Officers.

   b.   While SEO Team members began conducting knock and
notice admonishments at the front of the house, probation
officers assigned to the rear perimeter observed subjects
exiting a rear sliding glass door of the northeast bedroom of
the residence.  These individuals appeared to be attempting to
flee from the law enforcement officers that were in front of the
residence.

   c.   Based on the observations of the rear perimeter
team, in addition to their belief that the individuals exiting
the house were attempting to flee from law enforcement, the rear
perimeter team detained all of the individuals pending further
investigation.  One of the detained individuals was identified
as BELTRAN.  Moments after the individuals, including BELTRAN,
were detained by the rear perimeter team, Yashu was observed
exiting the same sliding glass door of the northeast bedroom.
Yashu was also detained.  At the time BELTRAN was detained, he
was found to be in possession of an Apple iPhone (SUBJECT DEVICE
1) and approximately $6,100 in cash, which were located in his
pants pockets.

   d.   Based on individuals fleeing out the back door of
the residence, and in the interest of officer safety, a
protective sweep of the residence was then conducted in an

attempt to locate any further individuals who might still be inside the house.

e.   Upon entering the northeast bedroom (that is, the same room from which all of the individuals had exited the residence) to conduct the protective sweep, Probation Officer Castillo observed what appeared to be the butt stock of a rifle protruding from clothing piled on the floor of a closet.   No other individuals were located within the residence.

f.   The SEO Probation Team then contacted Pomona Police Detective Daniel Watkins, who is a TFO on the SSTF, and advised him of the situation.   TFO Watkins, TFO Blair Hornby, FBI SA Melissa Whalen, and I arrived at the location a short time later.

g.   After arriving at the location, TFO Hornby conducted a walkthrough of the residence.   As TFO Hornby entered the northeast bedroom he observed a rifle lying on the bed.   The rifle had been rendered safe after having been removed from the clothing pile in the closet where Probation Officer Castillo found it.

h.   In the same bedroom, TFO Hornby observed a large, gallon-size Ziplock bag containing light-brown dehydrated mushrooms, believed to be psilocybin, on a box at the foot of the bed in plain sight.   TFO Hornby also observed a digital scale and bags containing what appeared to be marijuana on a dresser in the bedroom, also in plain sight.

i.   After seeing the rifle, narcotics paraphernalia, and narcotics in a room that appeared to be BELTRAN's, as well

as being told that BELTRAN was found with a large amount of cash in his pockets, TFO Hornby arrested BELTRAN pending further investigation. BELTRAN was then transported to the Pomona City Jail.

j. After speaking with the SEO Team, in addition to his own observations, TFO Hornby froze the location, having all law enforcement personnel exit the residence. TFO Hornby further directed law enforcement officers to ensure that no one entered the residence.

k. I then authored a search warrant for the 1059 W Grand Avenue location. This search warrant was signed and authorized by the Honorable Rubiya Nur, Superior Court Judge, Los Angeles County at approximately 11:00 a.m.

l. I responded back to the location with TFO Hornby to search the residence. When searching the northeast bedroom, TFO Hornby saw a wallet on a chair. The wallet contained BELTRAN's California identification card. TFO Hornby also found numerous documents inside of the room that contained BELTRAN's name.

m. Evidence collected from the northeast bedroom included the following:

i. A non-branded, non-serialized, short-barreled rifle which was originally located in a clothes pile on the floor of a closet;

ii. Approximately one pound and one ounce of psilocybin mushrooms located in a Ziplock bag in plain sight on top of a brown box at the foot of the bed;

iii.  Approximately 4.42 gross grams of methamphetamine located behind the bed;

iv.  Approximately 31.313 gross grams of marijuana and a scale located in the entertainment center in the bedroom;

v.  Three MDMA pills found in a drawer of the entertainment center in the bedroom;

vi.  A thirty-round firearm magazine and a drum style fifty-round high-capacity magazine[1] found in a closet of the bedroom;

vii. Forty-three rounds of 9mm ammunition found in a closet of the bedroom;

viii.   Nineteen rounds of ammunition found in a closet of the bedroom;

ix.  An Apple iPhone (SUBJECT DEVICE 2), found in a drawer where the marijuana and MDMA pills were found; and

x.  An Apple iPhone (SUBJECT DEVICE 3), found on a chair in the bedroom.

**B.   Miranda Interview of John Yashu**

12.  While at the Pomona City Jail, I, along with TFO Hornby and SA Whalen, interviewed Yashu.  This interview was audio and video recorded.  During the interview, TFO Hornby advised Yashu of his Miranda rights.  Yashu advised that he understood his rights.  In part during the interview, Yashu

---

[1] On June 4, 2019, TFO Hornby tested both the thirty round magazine and the fifty round drum style high-capacity magazine with regards to the recovered short-barreled rifle.  Each magazine appeared to be compatible with the rifle.

explained that BELTRAN was his step-son.  Yashu described his
own bedroom as being the one next to the bathroom, in the back
of the house on the driveway side.  As described by Yashu, this
would be the northwest bedroom of the residence.  When searching
this bedroom, I had observed Yashu's wallet containing his
driver's license, photographs of Yashu and his wife, as well as
mail and other indicia that indicated the bedroom was Yashu's.
When asked about the occupant of the northeast bedroom, Yashu
was unclear and evasive in his response.

### C.   Miranda Interview of BELTRAN

13.   While at the Pomona City Jail I, along with TFO Hornby
and SA Whalen, interviewed BELTRAN.  This video was audio and
video recorded.  During the interview, TFO Hornby advised
BELTRAN of his Miranda rights.  BELTRAN advised that he
understood his rights.  During the interview, BELTRAN advised
that Yashu was his step-father, and that his mother "Roberta"
normally lived there but was currently in prison[2].  When TFO
Hornby asked BELTRAN which bedroom belonged to him, he
immediately asked for a lawyer.  All questioning of BELTRAN was
discontinued at this time.

### D.   Firearm Nuclear DNA Comparison

14.   On February 7, 2019, TFO Hornby and I booked all
property recovered during the search warrant.  This included the
short-barreled rifle.  Prior to the rifle being placed into an

---

[2] Roberta Josephine Yashu was charged with violations of 18
U.S.C. § 1349 (Wire Fraud) and 18 U.S.C. § 1028A (Aggravated
Identity Theft) in Case Number CR 18-00182-DMG, resulting in a
six-month prison sentence.

evidence locker, TFO Hornby swabbed the rifle for potential DNA evidence collection.  Additionally, in the search warrant I authored for the residence, I also requested authority to obtain a DNA sample from BELTRAN.  I obtained the DNA swab from the inside of BELTRAN's cheek before he was booked.

15.  On February 27, 2019, the DNA swabs utilized on the recovered rifle, along with the DNA sample taken from BELTRAN, were submitted to the FBI's laboratory for DNA comparison.  Male DNA profiles were obtained from the DNA swabs from the rifle that originated from four individuals.  The lab report indicated a "Strong Support for Inclusion" for BELTRAN in the "Level of Support" portion of the report.  John Yashu was excluded as a potential contributor to the DNA obtained on the rifle.

### E.  ATF Firearm Analysis

16.  On May 31, 2019, Bureau of Alcohol, Tobacco, and Firearms Interstate Nexus Expert SA David Hamilton examined the recovered rifle.  SA Hamilton identified the rifle as an AR-style 5.56mm caliber semiautomatic rifle.  SA Hamilton found the rifle to be devoid of any manufacture markings, including a serial number.  The lack of any manufacture markings and or serial numbers eliminated any possible interstate nexus determinations.  SA Hamilton measured the firearm and determined that the overall length of the firearm measured approximately 27.75 inches with the stock fully extended and approximately 24.50 inches with the stock fully collapsed.  The barrel length of the firearm measured approximately 8.875 inches inclusive of the flash suppressor.  The flash suppressor did not appear to be

permanently affixed to the barrel, but was not removable with moderate hand pressure. With the flash suppressor removed, the true barrel length would be approximately 7.626 inches.

17. SA Hamilton concluded that the firearm was properly classified as a "short-barreled rifle" under 18 U.S.C. § 921(a)(8), and as "a rifle having a barrel or barrels of less than 16 inches in length" under 26 U.S.C. § 5845(a)(3). SA Hamilton further concluded that the recovered firearm is subject to the provisions of both the Gun Control Act and the National Firearms Act. The lack of a serial number precludes registration of this firearm in the National Firearms Registry and Transfer Record ("NFRTR").

**F.   Analysis of Recovered Narcotics**

18. On February 27, 2019, the suspected marijuana, the suspected MDMA, the suspected methamphetamine, and a sample of the suspected psilocybin seized from BELTRAN's bedroom was sent to the Los Angeles County Sheriff's Department Scientific Bureau ("LASD Laboratory") for analysis.

19. The LASD Laboratory reported that the substance believed to be methamphetamine was in fact methamphetamine with a weight of 3.9599 grams. The LASD Laboratory reported that a sample of the substance believed to be marijuana was tested and found to contain cannabis, with a total substance weight of 31.313 grams. The LASD Laboratory tested one of the three suspected MDMA pills, and confirmed that it was in fact MDMA. The LASD Laboratory tested the sample of the psilocybin

11

submitted, and confirmed that the sample in fact contained psilocyn and/or psilocybin.

20.  Based on my training and experience, which includes dozens of investigations involving narcotics sales, I believe BELTRAN was selling the narcotics that were found in his bedroom.  I know that individuals selling narcotics will commonly keep packaging and scales to ensure that their customers are receiving the proper amount of drugs requested. In the entertainment center in BELTRAN's bedroom, numerous plastic baggies, consistent with narcotics packaging, were found.  The methamphetamine found behind BELTRAN's bed appeared to be from the same type of packaging.  Additionally, a scale was also found in the entertainment center near the packaging and approximately three ounces of marijuana.  When contacted by law enforcement, BELTRAN was found to have $6,100 in U.S. Currency on his person.  In total, from BELTRAN's person and bedroom, $8,043[3] was seized.  In my training and experience, individuals who are selling narcotics will commonly have large amounts of cash.  Narcotics sales is a largely cash-based business due to the illegal nature of the transactions.  Based on the narcotics packaging, large amount of U.S. Currency, the scale, and the fact that four different types of narcotics, including a large amount of psilocybin, were found lead me to believe BELTRAN was selling the narcotics found in his bedroom.

---

[3] In addition to this amount, there was also $144.74 in coins (various denominations from pennies to dollar coins) found in BELTRAN's bedroom.

21.  Additionally, based on my training and experience, I know that individuals selling drugs will often have firearms for protection against rivals, protection from being robbed by prospective customers, and for potential use when collecting drug debts owed.  Based on the close proximity of the firearm to the narcotics, both of which were found in BELTRAN's bedroom, I believe that BELTRAN was utilizing the firearm in furtherance of his narcotics sales.

### G.  Additional Information Regarding the SUBJECT DEVICES

22.  Based on my training and experience investigating individuals selling narcotics and possessing firearms, I know that cellular phones, such as the SUBJECT DEVICES, are commonly utilized to facilitate criminal activity.  For example, cellular phones are commonly utilized to organize and arrange drug transactions between drug dealers and their customers.  Because drug dealers often attempt to keep their personal communications separate from their communications regarding their criminal activity, such persons frequently possess multiple cellular phones, such as those located in BELTRAN's bedroom.

23.  Additionally, when a drug dealer acquires a firearm with the unique characteristics of the firearm seized, namely that it is a short-barreled rifle, it is a particularly prized possession.  Individuals who possess such a firearm will often send text/mobile messages to associates that reference the firearm possession, how the firearm was acquired, or how the possessed firearm was being used.  I believe it is likely that these types of messages will be found on the SUBJECT DEVICES.

13

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

25.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

14

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    27.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

28.   For all of the reasons described above, there is probable cause to believe that BELTRAN has committed a violation of 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm) and 18 U.S.C § 924(c) (Possession of Firearm in Furtherance of a Drug Trafficking Crime).

/S/
_____
Frankie M. Valle
Task Force Officer
Federal Bureau of Investigation


Subscribed to and sworn before me
this (3th day of June, 2019.

**Frederick F. Mumm**
_____

UNITED STATES MAGISTRATE JUDGE

17